NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| XL SPECIALTY INSURANCE CO., et al., | |
| Plaintiffs, | CIVIL NO. 06-1234 (GEB) |
| v. | |
| WESTMORELAND COAL CO., et al., | MEMORANDUM OPINION |
| Defendants. | |

**BROWN, Chief District Judge**

This matter comes before the Court upon Defendants Westmoreland Coal Company and Westmoreland Mining, LLC (hereinafter "Defendants") Motion to Dismiss the Complaint for lack of Subject Matter Jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1), and in the alternative Motion to Dismiss the Complaint as to Westmoreland Mining, LLC for lack of Personal Jurisdiction [Docket Entry #27]. The Court, having considered the parties' submissions and having decided this matter without oral argument pursuant to Fed. R. Civ. P. 78, and for the reasons discussed below, will deny Defendants' Motion to Dismiss the Complaint for lack of Subject Matter Jurisdiction as well as Defendants' Motion to Dismiss the Complaint as to Westmoreland Mining, LLC for lack of Personal Jurisdiction.

**I.      BACKGROUND**

Plaintiffs XL Specialty Insurance Company and XL Reinsurance American, Inc. (hereinafter "Plaintiffs") filed a Complaint for Declaratory Judgment on March 1, 2006. The Complaint alleges that on or about February 23, 2001, Plaintiffs issued a surety bond listing CGU

as surety in favor of the Trustees of the United Mine Workers of America 1992 Benefit Plan at Defendants' behest. (Complaint, ¶ 9). The penal sum for the bond was $23,780,196.00 and existed to secure Defendants' obligations to provide retiree health benefits to its employees pursuant to the Coal Industry Retiree Health Benefit Act of 1992, Pub. L. No. 102-486, 106 Stat. 3036 (1992). (Id.; Defendants' Motion, p. 2).

The Health Benefit Act requires that specified coal operators contribute to a benefit plan to fund health benefits for coal workers and their dependents who retired prior to 1992. (Defendants' Motion, p. 2). The Act further requires that the specified coal operators contribute annually to the benefit plan, that the funds in the benefit plan be administered by the plan trustees and that the coal operators post a bond (which is calculated annually based upon projected benefit costs allocated to each operator for the current year) or other adequate security to assure their ability to meet their annual financial obligations to the plan. (Id.).

On April 9, 2001, a Rider was executed by the parties reducing the bond penal sum to $21,292,488.00. (Complaint, ¶ 10). On May 23, 2001, Defendant Westmoreland Coal executed a Continuous Contract of Indemnity in favor of Plaintiffs. (Defendants' Motion, p. 3). The indemnity agreement requires Defendants to indemnify the surety from all claims, costs, damages and losses which the surety may sustain if Defendants fail to perform under the indemnification agreement. (Defendants' Motion, p. 3). Defendant Westmoreland Mining also executed either an identical or similar indemnity agreement on or about that same date. (Id.; Complaint, ¶ 15). Pertinent language contained in one or both of the indemnity agreement(s) provides "that the Surety may decline to execute, provide or procure any bond(s) applied for and may cancel or terminate any bond(s) executed by the Surety without incurring any liability whatsoever to

[Westmoreland]." (Complaint, ¶ 16).

In or about April or May of 2001, Plaintiffs' surety administrative and underwriting home office moved from New York, New York to Warren, New Jersey. Defendant Westmoreland Mining, LLC, at all relevant times, was headquartered and organized outside of New Jersey.

On January 25, 2002, a subsequent Rider to the surety bond was executed substituting Defendants in place of CGU as the surety. (Id. at ¶ 11). The language of the surety bond provides that it is "continuous in form and shall remain in full force and effect until terminated by the Obligee or cancelled by the Surety as hereinafter provided . . .this bond shall not be canceled within the initial three years . . . [A]fter the close of the initial three years, the Surety shall not be released hereunder unless or until the Surety provides to the Obligee 90 calendar day notice by registered mail of the cancellation of this bond." (Id. at ¶ 12).

On November 14, 2003, Plaintiffs served Defendants a Notice of Cancellation of the Bond. In response to the notification, the plan trustees demanded that Defendants replace the existing bond with an acceptable security on or before February 6, 2004, or it would make demand upon Plaintiffs for payment of the bond's penal sum in accordance with the bond's terms. (Complaint, ¶ 20). Defendants were subsequently unable to secure a replacement bond and on January 13, 2004, Plaintiffs and Defendants met to discuss alternatives to cancellation. (Id. at 21; Defendants' Motion, p. 4). The parties were unable to reach an agreement, and on February 6, 2004, the plan trustees made written demand upon Plaintiffs to pay the penal sum of the surety bond within thirty days of February 23, 2004 (the effective date of the bond's cancellation). (Complaint, ¶ 23).

Faced with a $21,292,488.00 payment, on February 5, 2004, Plaintiffs wrote to Defendants informing them that Plaintiffs had cancelled the bond and that they sought indemnification for the penal sum. (Id. at ¶ 25; Defendants' Motion, p. 5). On February 13, 2004, Defendants advised Plaintiffs that the cancellation of the surety bond was contrary to its terms and that indemnification agreement did not encompass liability that Plaintiffs themselves assumed when they unilaterally terminated the bond. Defendants further advised that cancellation of the surety bond would be considered tortious and that "all redress available at law and in equity" would be pursued should Plaintiffs cancel the bond. (Defendants' Motion, Exhibit H). Plaintiffs responded via written correspondence dated February 19, 2004, in which Plaintiffs rejected Defendants' request for rescission of cancellation and reaffirming their previously articulated demands. (Complaint, ¶ 27).

On February 20, 2004, Plaintiffs rescinded their cancellation notice. (Complaint, ¶ 29; Defendants' Motion, p. 5). The withdraw of the cancellation was to allow the parties to continue to meet and confer, with the hopes of reaching some sort of agreement and/or settlement. (Id.).

The parties thereafter endeavored to reach an agreement for a period of fourteen months. (Id. at ¶ 30; Defendants' Motion, p. 5). No resolution was ultimately reached, however, and currently all settlement efforts have ceased. (Id.). On April 12, 2006, Defendants filed the instant Motion to Dismiss.

## II. DEFENDANTS' MOTION TO DISMISS

Defendants' Motion to Dismiss asserts that Plaintiffs' Complaint should be dismissed for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) as there is currently no case or controversy for the Court to consider and any determination based upon the demands of

Plaintiffs' Complaint would be tantamount to an advisory opinion.

Defendants assert, in the alternative, that Westmoreland Mining, LLC should be dismissed as a defendant for lack of personal jurisdiction as the Court lacks general and specific personal jurisdiction over Westmoreland Mining, LLC.

**III.    DISCUSSION - Motion to Dismiss Complaint under Rule 12(b)(1)**

    **A.    Applicable 12(b)(1) Standard**

The purpose of a motion to dismiss for failure to state a claim is to test the legal sufficiency of the allegations contained in the complaint.  Kost v. Kozakiewicz, 1 F.3d 176, 183 (3d Cir. 1993).  Under a Rule 12(b)(6), a court must determine whether the allegation contained in the complaint, construed in the light most favorable to the plaintiff, show a set of circumstances which, it true, would entitle the plaintiff to the relief he requests.  Gibbs v. Roman, 116 F.3d 83, 86 (3d Cir. 1997) (citing Nami v. Fauver, 82 F.3d 63, 65 (3d Cir. 1996)); The Mountbatten Surety Company, Inc. v. Brunswick Insurance Agency, 2000 WL 1042816 (E.D.Pa. 2000).

The standard for Rule 12(b)(1), however, was significantly more difficult to parse until the Third Circuit clarified the issue in Mortensen v. First Federal Savings & Loan Ass'n, 549 F.2d 884 (3d Cir. 1977).  In Mortensen, the Third Circuit divided Rule 12(b)(1) motions into two categories: facial and factual.  Id. at 891.  A facial attack on jurisdiction is directed to the sufficiency of the pleading as a basis for subject matter jurisdiction.  "In reviewing a facial attack, the court must only consider the allegations of the complaint and documents referenced therein and attached thereto in the light most favorable to the plaintiff."  Gould Electronics Inc. v. United States, 220 F.3d 169, 176 (3d Cir. 2000).  Thus, a facial challenge offers to the plaintiff

similar safeguards to those related to Rule 12(b)(6) motions.  The Medical Society of New Jersey v. Mark S. Herr, 191 F.Supp.2d 574, 578 (D.N.J. 2002).

A factual attack on jurisdiction under 12(b)(1), however, is a stark distinction to a 12(b)(6) motion.  There, the movant calls into question the essential facts underlying a claim of subject matter jurisdiction.  "Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction[,] its very power to hear the case[,] . . . the trial court is free to weight the evidence and satisfy itself as to the existence of its power to hear the case."  Mortensen at 891; see also Carpet Group Int'l v. Oriental Rug Importers Ass'n, Inc., 227 F.3d 62, 69 (3d Cir. 2000).  Under this standard, a court "may proceed in a way it cannot under rule(s) 12(b)(6) . . ."  Medical Society at 578, and no presumptive truthfulness attaches to plaintiff's allegations of jurisdictional facts.  Robinson v. Dalton, 107 F.3d 1018, 1021 (3d Cir. 1997) (citing Mortensen at 891).  Therefore, in a 12(b)(1) factual challenge, a court can consult material outside the pleadings, and the burden of proving jurisdiction lies with the plaintiff.  Gould Electronics at 178.  "In general, when a Rule 12(b)(1) motion is supported by a sworn statement of facts, the court should treat the defendant's challenge as a factual attack on jurisdiction."  Medical Society at 578 (citing International Ass'n of Machinists & Aerospace Workers v. Northwest Airlines, 673 F.2d 700, 711 (3d Cir. 1982)).

      **B.**    **Case and Controversy/Ripeness**

Article III of the United States Constitution contains express limitations on federal court jurisdiction.  Among these limitations are what are known as "Case" or "Controversy" limitations, which are considered a prerequisite to all federal actions.  Presbytery of New Jersey of Orthodox Presbyterian Church v. Florio, 40 F.3d 1454, 1462 (3d Cir. 1994).

In the Third Circuit, to satisfy the constitutional case or controversy requirement an action must present "(1) a legal controversy that is real and not hypothetical; (2) a legal controversy that affects an individual in a concrete manner so as to provide the factual predicates for reasoned adjudication, and (3) legal controversy so as to sharpen the issues for judicial resolution." Armstrong World Industries, Inc. v. Adams, 961 F.2d 405, 411 (3d Cir. 1992).

Within the case and controversy doctrine lie several sub-categories of limitations on federal court jurisdiction, including the doctrines of standing, mootness and ripeness. The ripeness doctrine is centrally concerned with preventing "the courts through the avoidance of premature adjudication, from entangling themselves in abstract disagreements." Artway v. Attorney General of the State of N.J., 81 F.3d 1235, 1246-47 (3d Cir. 1996).

### C. Declaratory Judgment

Title 28, United States Code, Section 2201, also known as the Declaratory Judgment Act, provides a means to allow federal courts to "declare the rights and other legal relations of any interested party seeking such declaration". Wyatt, Virgin Islands, Inc. v. Government of the Virgin Islands, 385 F.3d 801 (3d Cir. 2003). A declaratory judgment can only be made when there is a "case of actual controversy." Id.

The implementation of the Declaratory Judgment Act was facilitated to foster early adjudication of disputes before escalation. Nevertheless, "[t]he existence of a case and controversy is a prerequisite to all federal actions, including those for declaratory relief." Presbytery of New Jersey of Orthodox Presbyterian Church v. Florio, 40 F.3d 1454, 1462 (3d Cir. 1994).

### D.     Analysis

The dichotomy between declaratory judgments and the doctrine of ripeness has long since been acknowledged by the Third Circuit Court of Appeals. Step-Saver Data Systems, Inc. v. Wyse Technology, 912 F.2d 643, 646. Specifically, the Third Circuit stated in its analysis of a ripeness claim in a declaratory judgment action:

> . . . it is difficult to define the contours of the ripeness doctrine with precision. The task is even more problematic when defining ripeness in the context of declaratory judgment actions, for two reasons. First, there is the considerable amount of discretion built into the Declaratory Judgment Act itself. Even when declaratory actions are ripe, the Act only gives a court the power to make a declaration regarding 'the rights and other legal relations of any interested party seeking such declaration,' 28 U.S.C. § 2201; it does not require that the court exercise that power. Second, declaratory judgments are issued before 'accomplished' injury can be established, and this *ex ante* determination of rights exists in some tension with traditional notions of ripeness.

Id. at 646-47. Despite this relationship between the two, the Third Circuit emphasized the following:

> Nonetheless, because the Constitution prohibits federal courts from deciding issues in which there is no 'case[]' or 'controversy,' U.S. Const. art. III, § 2, declaratory judgments can be issued only when there is 'an actual controversy,' 28 U.S.C. § 2201. The discretionary power to determine the rights of parties before injury has actually happened cannot be exercised unless there is a legitimate dispute between the parties.

Id. at 647. The Third Circuit in Step-Saver thereafter provided a three-prong analysis to utilize when considering a claim of ripeness in a declaratory judgment action, which are: (1) the adversity of the interests of the parties; (2) the conclusiveness of the judicial judgment; and (3) the practical help, or utility of that judgment. Id.

### i.     *adversity of the interests of the parties*

In consideration of the preceding, the Court turns to the first prong of Step-Saver, that is,

the adversity of the interests of the parties. Within this first prong, the court of appeals has noted two different facets for consideration. First, whether the plaintiff alleges that "present harms will flow from the threat of future action," Armstrong World Indus. v. Adams, 961 F.2d 405, 412 (3d Cir. 1992), or whether the plaintiff's action is contingent, i.e., whether the action requires the occurrence of some future event before the action's factual predicate is complete. Id. at 411-12; Bell Atlantic Corporation v. MFS Communications Co., Inc., 901 F.Supp. 835 (D.Del. 1995).

Further, the Third Circuit has noted that although the party seeking review need not have suffered a "completed harm" to establish adversity of interest, Armstrong at 412, it is necessary that there be a substantial threat of real harm and that the threat "must remain 'real and immediate' throughout the course of the litigation." Salvation Army v. Department of Community Affairs, 919 F.2d 183, 192 (3d Cir. 1990). "Thus, where intervening events remove the possibility of harm, 'the court must not address the now-speculative controversy.'" Id.; The Presbytery of New Jersey v. Florio, 40 F.3d 1454, 1463 (3d Cir. 1994).

The Third Circuit has additionally noted that the adversity of interest prong is substantially similar to the "injury-in-fact" prong of constitutional standing: "in measuring whether the litigant has asserted an injury that is real and concrete rather than speculative and hypothetical, the ripeness inquire merges almost completely with standing." Joint Stock Soc'y v. UDV North Am., 266 F.3d 164, 174 (3d Cir. 2001).

Here, the adversity of interests are clearly noted by both parties. Plaintiffs wish to cancel the surety bond and Defendants do not want the bond cancelled. Several contractual agreements, riders and indemnification contracts had been created during the execution of the bond. The contracts, in essence, will determine whether cancellation of the bond results in a breach of

9

contract on Plaintiffs' behalf.  Those documents are intact, and it is evident from the submissions of the parties that Plaintiffs and Defendants will not alter their diverging interests.

To that end, Defendants' arguments regarding contingencies yet to come are inaccurate.  Defendants clearly intend to sue should such cancellation occur.  Costs have already begun for Plaintiffs in their filing of the Complaint for Declaratory Judgment.  It is clear to this Court that Defendants seek to place Plaintiffs in a no-win situation.  Cancel the bond and we sue.  Keep the bond and be forced to continue to engage in business you no longer which to engage in.

Under these circumstances, Plaintiffs face and will continue to face a real and substantial threat of harm in the amount of $22 million dollars penalty to the plan trustees because Defendants are unable to secure a new bond, as well as substantial legal fees to recoup their losses from Defendants under the indemnification contract(s), or the harm of continuing to provide a bond they no longer wish to provide.  As such, declaratory judgment is appropriate.

The Court therefore finds that Plaintiffs have presented sufficient adversity of interests between themselves and Defendants.

### ii. *conclusiveness of the judicial judgment*

The second Step-Saver prong that must be satisfied in order to establish whether an action is ripe looks to whether: (1) "issues are purely legal (as against factual)"; and (2) "further factual development would be useful."  Ne Hub Partners v. CNG Transmission Corp., 239 F.3d 333, 342 (3d Cir. 2001).  "A declaratory judgment granted in the absence of a concrete set of facts would itself be a 'contingency,' and applying it to actual controversies which subsequently arise would be an 'exercise in futility.'"  Armstrong at 412 (quoting Step-Saver at 648).  "Conclusiveness" is a short-hand term for determining whether a declaratory judgment would in fact determine the

parties' rights as opposed to merely serving as an advisory opinion. Id. at 344. Issues which are predominately legal are particularly "amenable to a conclusive determination in a preenforcement context." Presbytery at 1468; Surrick v. Killion, 2005 WL 913332 (E.D.Pa. 2005). However, an "actual factual setting" is "particularly important in cases raising allegations of an unconstitutional taking." Presbytery at 1464.

The Third Circuit has found, however, that "plaintiffs raising predominantly legal claims must still meet the minimum requirement for Article III jurisdiction." Armstrong at 421 (citing Office of Communication of United Church of Christ v. FCC, 826 F.2d 101, 105 (D.C.Cir. 1987) ("[T]he presence of 'a purely legal question' is not enough, of itself, to render a case ripe for judicial review, not even as to that issue.")). In that vein, the Third Circuit adopted the rationale used by the Eleventh Circuit Court of Appeals in Atlanta Gas Light Co. v. United States Department of Energy, 666 F.2d 1359, 1363, n.7 (11th Cir. 1982) in which the court held that its conclusion of ripeness was supported by factors which included the fact that the parties' claims would not substantially change in future litigation, that the current parties were appropriate to raise the issues at bar and that the parties would be subject to enforcement of the challenged act were it implemented.

In the case at bar, Plaintiffs satisfy each of the elements promulgated by the Eleventh Circuit and adopted by the Third Circuit. First, there is no indication that the parties' claims would alter, either substantially or inconsequentially, should Plaintiffs cancel the bond and subsequently be sued by Defendants. Ultimately, the issue would remain one of contract interpretation. Second, Plaintiffs and Defendants as listed in the instant declaratory judgment action would be the parties of interest in a suit by Defendants. Third, the parties would be

11

subject to the enforcement of a declaratory judgment as contract law firms falls within said purview. Korvettes, Inc. v. Brous, 617 F.2d 1021 (3d Cir. 1980) (holding that a declaratory judgment action was proper to resolve dispute as to the validity and enforceability of specific contractual obligations).

Plaintiffs therefore satisfy the second prong of Step-Saver as the factual underpinnings are fully developed, and as the parties involved in the instant action are the relevant parties to the litigation who would be subject to declaratory judgment enforcement.

### iii. *the practical help, or utility of that judgment*

The third and final prong of the Step-Saver analysis requires courts to look to: (1) the hardship of the parties of withholding a decision; and (2) whether the claim involves uncertain and contingent events. Ne Hub Partners at 342 n.9. Put alternatively, "the utility inquiry looks to 'whether the parties' plans of actions are likely to be affected by a declaratory judgment' such that the court is 'convinced that by its action a useful purpose will be served.'" Surrick at *8 (citing Step-Saver at 649).

Plaintiffs readily satisfy this prong of Step-Saver. If the declaratory judgment were determined, then both parties would be aware of what would occur when Plaintiffs cancelled the surety bond in question. Further, if the parties knew what would occur upon cancellation of the bond, it may affect the decision by Plaintiffs to cancel the bond or Defendants decision to sue. In that regard, a determination regarding contract interpretation under a declaratory judgment would be useful to the parties.

Because Plaintiffs have demonstrated adversity of interests between the parties, conclusiveness and utility, Plaintiffs have satisfied all three prongs of Step-Saver and

Defendants' Motion to Dismiss under Rule 12(b)(1) is denied.

### IV.     DISCUSSION - Motion to Dismiss Complaint as to Defendant Westmoreland Mining, LLC for lack of Personal Jurisdiction

Rule 4(e) empowers a court to exercise personal jurisdiction over a non-resident defendant to the extent authorized by the law of the state in which that court sits.  Fed. R. Civ. P. 4(e);  North Penn Gas Co. v. Corning Natural Gas Corp., 897 F.2d 687, 689 (3d Cir. 1990); Romero v. Aerolineas Argentinas, 834 F. Supp. 673, 678 (D.N.J. 1993).  New Jersey's long-arm statute permits the exercise of *in personam* jurisdiction as far as is constitutionally permissible under the Due Process Clause of the Fourteenth Amendment.  See N.J. Ct. R. 4:4-4; Carteret Savings Bank, FA v. Shushan, 954 F.2d 141, 145 (3d Cir.1992); Romero at 678.  Therefore, the question as to whether this Court has jurisdiction over Defendant Westmoreland Mining shall be determined in accordance with federal constitutional law.  Decker v. Circus Circus Hotel, 49 F. Supp.2d 743, 745 (D.N.J. 1999) (citing Mesalic v. Fiberfloat Corp., 897 F.2d 696, 698 (3d Cir. 1990)).

The Supreme Court has delineated two categories of *in personam* jurisdiction, general or specific, under which a court may exercise jurisdiction over an absent defendant.  See Mesalic v. Fiberfloat Corp., 897 F.2d 696, 699 (3d Cir. 1990) (citation omitted).  Each will be considered in turn.

#### A.     General Jurisdiction

If a party is subject to the general jurisdiction of a state, he or she can be called to answer any claim against him or her, regardless of whether the subject matter of the cause of action has any connection to the forum.  Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414 n.9 (1984); Mellon Bank (East) PSFS, Nat'l Ass'n v. Farino, 960 F.2d 1217, 1221 (3d Cir.

1992).  To establish general jurisdiction, a plaintiff must demonstrate that the defendant has systematic and continuous contacts with the forum state.  Helicopteros at 414, n.9; International Shoe at 320.

Plaintiffs do not seriously argue that systematic and continuous contacts are present in the case at bar, and the Court finds that there are not.  Defendant Westmoreland Mining is not incorporated or located in New Jersey, and they do not conduct their day to day business in or through New Jersey.  See Helicopteros at 415-16.  The contacts that do exist - namely (and as more specifically discussed *supra*) telephone and mail communications and in-person meetings - are not systematic or continuous enough to sustain general jurisdiction over defendants.  The Court, therefore, must continue to the next inquiry and determine whether specific jurisdiction exists over Defendant Westmoreland Mining.

### B.     Specific Jurisdiction

A court has specific jurisdiction over an absent defendant where the defendant purposely directs its activities at residents of the forum state, and the litigation results from alleged injuries arising from those specific in-state activities.  Burger King at 472 (citing Helicopteros Nationales de Columbia, S.A. v. Hall, 466 U.S. 408, 414 (1984)).  Additionally, due process requirements are satisfied only where the defendant has "'certain minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'"  Helicopteros at 414 (quoting International Shoe at 316).  This principle has given rise to a two-prong test: first, the defendant must have had constitutionally sufficient "minimum contacts" with the forum, and second, if minimum contacts are shown, jurisdiction may be found where the court determines, in its discretion, that to do so would comport with "traditional

notions of fair play and substantial justice." Vetrotex Certainteed Corp. v. Consolidated Fiber Glass Prods., 75 F.3d 147, 150-51 (3d Cir. 1996).

### i.     *minimum contacts*

Minimum contacts are considered the "constitutional touchstone" for determining whether the exercise of personal jurisdiction comports with due process. Asahi Metal Indus. Co., Ltd. v. Superior Court of Cal., Solano County, 480 U.S. 102, 108-09 (1987); Burger King at 474. Minimum contacts exist if the defendant "'purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'" Asahi at 109 (quoting Burger King at 474). In other words, a defendant's conduct and their connection with New Jersey must be such that they "should reasonably anticipate being haled into court[] here." World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980); Vetrotex at 151.

The unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contacts with the forum state. Hanson v. Denckla, 357 U.S. 235, 253 (1957). Conversely, where the defendant "deliberately" engages in significant activities within a state or creates "continuing obligations" between him or herself and residents of the forum, minimum contacts will be found to exist. Burger King at 476.

Here, Defendant Westmoreland Mining entered into an indemnification contract with Plaintiffs either immediately before or directly after Plaintiffs moved their principal place of business to New Jersey. Although in some contexts, a single contract may be enough to permit a finding of jurisdiction, standing alone, a contract with an out-of-state party does not automatically establish minimum contacts. Id. at 478. Rather, the Court must examine "prior

negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing" to determine whether Defendant Westmoreland Mining purposefully established minimum contacts with the forum. Id. at 479.

Regarding the "prior negotiations" which led to Defendant Westmoreland Mining entering into an indemnification agreement with Plaintiffs, it is clear that any negotiation that occurred prior to the contract did not occur in New Jersey. On this basis, personal jurisdiction over Defendant Westmoreland Mining cannot be exercised.

The "future consequences" of the contract along with "the parties' actual course of dealing" present a different set of circumstances which support a finding of minimum contacts. First, the indemnification contract was a long-term agreement, and such long-term commitments with state residents contribute to establishing minimum contacts with the forum, as they create "continuing obligations" among the parties. Id. at 476 (citing Travelers Health Ass'n v. Virginia, 339 U.S. 643, 648 (1950). The agreement created a "continuing obligation" for Defendant Westmoreland Mining insofar as they were required to indemnify the surety from all claims, costs, damages and losses which the surety may have sustained if Defendants failed to perform under the indemnification agreement. Because such a continuing relationship had been established, Defendant Westmoreland Mining should have anticipated being "haled into court" in New Jersey, or any other state Plaintiffs ultimately chose to headquarter in.

Moreover, courts have found that communications directed into New Jersey are significant in finding in favor of minimum contacts. See Grand Entertainment Group, Ltd. v. Star Media Sales, Inc., 988 F.2d 476, 482-83 (3d Cir. 1993) (holding that twelve telephone calls into New Jersey, coupled with negotiations for an agreement that would have created rights and

16

obligations among citizens of New Jersey provided sufficient minimum contacts); see also Carteret Savings Bank, FA v. Shushan, 954 F.2d 141, 147-48 (3d Cir. 1992) (finding that minimum contacts were established based upon telephone calls and correspondence sent into New Jersey and one meeting in New Jersey); Burger King at 476 ("[I]t is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines."); Kultur Internat'l Films, Ltd. v. Covent Garden pioneer, FSP., Ltd., 860 F.Supp. 1055 (D.N.J. 1994) (phone calls, telefaxes and letters sent in connection with negotiations and agreements confer jurisdiction); Eaton Corporation v. Maslym Holding Company, 929 F.Supp. 792 (D.N.J. 1996) (same).

In the case at bar, as briefly recited *infra*, Defendants engaged in numerous communications with Plaintiffs, including several mailings, telephone calls and in-person meetings, all aimed at or conducted in the borders of New Jersey. (Plaintiff's Opposition, Dixon Cert. ¶¶ 30-44). These communications evidence that Defendant Westmoreland Mining, LLC, along with their co-defendant and parent company Defendant Westmoreland Coal Company "deliberately" engaged in significant activities in New Jersey and "purposely avail[ed]" themselves of the privilege of conducting activities in this state.[1]

---

[1] The Court rejects Defendants assertions that Defendant Westmoreland Coal Company was the only defendant engaged in communications and negotiations with Plaintiffs during the referenced period of contact. First, Defendants provide no evidence to support such an accusation. Further, Plaintiffs represent that it was their understanding that the communications were on behalf of Westmoreland Coal and its subsidiaries, including Westmoreland Mining. To suggest that Westmoreland Mining was never a participant in the negotiations to prevent the cancellation of the bond or the indemnification by Defendants resulting from such cancellation is to suggest that Westmoreland Mining did not at that time object to such cancellation or indemnification. Such a suggestion could alter the "landscape" of this civil action in such a way as to negate the need for a declaratory judgment as Plaintiffs could simply cancel the bond and obtain indemnification from Defendant Westmoreland Mining. This Court will therefore consider all communication conducted between Plaintiffs and Defendants to include Defendant Westmoreland Mining.

### ii.     *fair play and substantial justice*

Once a plaintiff has made out a *prima facie* case of minimum contacts, the defendant must present a "compelling case that the presence of some other considerations would render jurisdiction unreasonable." Burger King at 477.  In determining whether the assertion of jurisdiction violates traditional notions of fair play and substantial justice, the court must consider several factors: the burden on the defendant, the interests of the forum state, plaintiff's interest in obtaining relief, the interstate judicial system's interest in obtaining efficient resolution of controversies, and, if relevant, the shared interest of the several states in furthering substantive social policies.  Asahi at 113.  A finding that jurisdiction would be unreasonable under traditional notions of fair play and substantial justice, despite a finding of minimum contacts, would ultimately invalidate any jurisdictional hold a forum state may otherwise maintain.  D'Almeida v. Stork Brabant B.V., 71 F.3d 50 (1st Cir. 1995).  The Court finds that these factors weigh heavily in favor of exercising jurisdiction.

Specifically, and in contemplation of the Asahi factors, the Court notes that this civil action was originally brought before the United States District Court for the Southern District of New York.  There Defendants argued that venue was improper.  Defendants ultimately entered into a consensual agreement with the District of New York and Plaintiffs, in which Defendants consented to having the case transferred in its entirety to New Jersey.  Now, Defendant Westmoreland Mining seeks to have this Court declare that New Jersey does not maintain personal jurisdiction over them.  To agree to venue in New Jersey and then argue lack of personal jurisdiction in said forum state is disingenuous.  Defendant Westmoreland Mining is a party to this action, and rightfully so, as they have entered into an indemnification agreement that is directly at issue with what Plaintiffs seek to obtain declaratory judgment upon.  Defendant

Westmoreland Mining must participate in the adjudication process, somewhere in these United States. Their burden of litigation in New Jersey is no greater than in New York or any other state besides the state in which Defendant Westmoreland Mining is headquartered. Indeed, as the New York District Court noted, New Jersey maintains an interest in this civil action's adjudication as XL was headquartered here and conducted business from here for approximately five years, and as the bulk of the business conducted between the parties happened here. Further, it is not in the interest of judicial economy to continue to shift this case from state to state, and as previously discussed, Plaintiffs maintain a viable interest in obtaining a declaratory judgment regarding the interpretation of the underlying surety bond and indemnification contracts relevant to the case at bar.

The Court therefore finds that Plaintiffs have demonstrated that the forum state of New Jersey has personal jurisdiction of Defendant Westmoreland Mining, LLC, and Defendant Westmoreland Mining's Motion to Dismiss for lack of Personal Jurisdiction is denied.

## IV. CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss the Complaint under Rule 12(b)(1) for lack of Subject Matter Jurisdiction, as well as Defendant Westmoreland Mining's alternative Motion to Dismiss for lack of Personal Jurisdiction is DENIED.

s/Garrett E. Brown, Jr.<br>
**HONORABLE GARRETT E. BROWN, JR**<br>
**CHIEF UNITED STATES DISTRICT JUDGE**

Dated: June 26, 2006